MIAMI VALLEY BROADCASTING CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miami Valley Broadcasting Corp. v. Commissioner
Docket No. 6302-71.
United States Tax Court
T.C. Memo 1979-509; 1979 Tax Ct. Memo LEXIS 11; 39 T.C.M. (CCH) 760; T.C.M. (RIA) 79509; December 26, 1979, Filed Bernard J. Long,James A. Treanor, III,D. Todd Christofferson,Richard L. Braunstein, and Patrick Hays Allen, for the petitioner. Robert T. Hollohan, for the respondent. FEATHERSTON
SUPPLEMENTAL MEMORANDUM OPINION
FEATHERSTON, Judge: In its Memorandum Findings of Fact and Opinion (T.C. Memo. 1976-194), filed June 17, 1976, this Court found that the fair market value of a leasehold interest acquired by petitioner in a corporate liquidation on June 30, 1964, was $350,000 *12 and that of a baseball television contract acquired in the same liquidation was $25,000. On appeal, the Court of Appeals for the Sixth Circuit affirmed our finding as to the baseball television contract but remanded the case for "revaluation of the leasehold interest including an explanation of the formula used to value the lease and the factors rendering that choice of formula appropriate." On October 31, 1963, petitioner acquired the entire outstanding stock of San Francisco-Oakland Television, Inc. (SFO), which owned and operated television station KTVU in OaklandCalifornia. Thereafter, on June 30, 1964, SFO was liquidated into petitioner pursuant to sections 332 [1]/ and 334(b)(2). Among the assets petitioner acquired in the liquidation was the leasehold interest in the building and land used for the office and studio facilities of KTVU. This lease was entered into between the City of Oakland acting through its Board of Port Commissioners (the Port) and SFO on January 9, 1958. It had a term of 20 years and covered 27,000 *13 square feet in a building specially constructed by the Port for SFO; 11,000 square feet consisted of office space, and 16,000 square feet consisted of production facilities. The rent was renegotiated in August 1963, and thereafter was $26,200 per year (after applying a local tax credit discussed in footnote 19, infra). Section 334(b)(2) provides that the basis which a taxpayer obtains as a result of a liquidation distribution "shall be the adjusted basis of the stock with respect to which the distribution was made." After certain prescribed adjustments are made, that adjusted basis is fractionalized and apportioned among the assets received in the liquidation in proportion to their net "fair market value"; the apportioned amounts become the individual basis for each asset in the hands of the taxpayer. Sec. 1.334-1(c)(4) (viii), Income Tax Regs.[2]/ *14 The parties have agreed upon the values of all assets except the leasehold and the baseball television contract and the fair market value of the latter is now adjudicated. The only issue remaining is what part of the adjusted basis should be apportioned to the leasehold interest in the office and studio facilities of KTVU. That issue turns on the fair market value of petitioner's rights under the lease as of June 30, 1964, the date of the liquidation of SFO. 1. Formula for Valuation of Leasehold
In our Memorandum Findings of Fact and Opinion, [3]/ we concluded that the lease had a fair market value as of June 30, 1964, because the rent prescribed by the lease was less than that for which comparable properties were being leased. We pointed out, however, that petitioner's experts had failed to discount the annual savings of rent to their June 30, 1964, value, and in our view such a discount was appropriate. In the light of the entire record, we found that the lease had a fair market value of $350,000 on June 30, 1964. We adhere to that view. The parties have now agreed, *15 as the Court of Appeals has stated, [4]/ that the difference between the actual rent to be paid over the remaining 14-year term of the lease and the fair market rental [5] for the same period was $957,667, [6] a difference of approximately $68,012.04 per year ($5,667.67X12 months). In view of this agreed differential and the absence of any actual market for the lease, we think the proper method for valuation of the leasehold is the income approach. *16 Under that approach, [7]/ it is necessary to ascertain or estimate the present, in this case, the June 30, 1964, value of the anticipated savings in rent over the following 14-year period of ownership of the lease. The present worth of future income or savings, such as the anticipated periodic savings in rent at issue here, is less than the face amount of that income because money not in possession is subject to the risk that it will not be received. Moreover, unlike money in possession, it cannot itself be used to earn income. The longer the period before the income is to be realized, the greater the difference between the face amount and the present value of future income. To compute the present value of the excess of the economic rent over the contract rent, an appropriate discount factor is applied to the future income and the discount must reflect those considerations. In addition, the discount factor must reflect the hazards of the investment, such as the inherent risks that business or economic conditions may change over the period of the lease with the result that continued use of the leased premises may not be feasible; the practical problems of marketing the lease *17 or otherwise liquefying the anticipated savings at any given time; and the burdens and limitations imposed by the terms of the lease. In other words, in fixing the discount rate account must be taken of the same factors that investors in the marketplace would take into account. *18 The application of the formula for applying the determined discount to the lessee's annual rental advantage is illustrated in The Appraisal of Real Estate, prepared by the Textbook Revision Subcommittee, American Institute of Real Estate Appraisers (7th ed. 1978), pp. 474-475. That treatise gives the following illustration of the use of the formula where the land has a value of $80,000 and is improved with a new building with a (cost) value of $426,000 and where the annual contract rent is less than the annual economic rental value: In example 1 the contract rental equals the economic rent. In theory, the leasehold has no value, because there is no margin of net income attributable to the leasehold interest and the value of the lessor's interest is the value of the property. However, possession of the premises under the lease may in certain circumstances have some value to the lessee. EXAMPLE 2. Annual contract rent is less than economic rent. 20-year lease. Same economic rent and property reversion assumed as in Example 1. Annual economic rental value
$50,000
Annual contract rent
39,000
Lessee's annual advantage
$11,000
Lessor's leased fee interest
Present value of contract rent for
20 years discounted at 8.25%
$39,000X9.638148 na
$376,000 nb
Present value of property rever-
sion in 20 years discounted at 9%
$280,000X.178431 nc
50,000 nb
Total present value of lessor's
leased fee interest
$426,000 nb
Lessee's leasehold interest
Present value of lessee's $11,000
annual rental advantage for 20
years, discounted at 12.5%
$11,000X7.241353 nd=
80,000 nb
Total value leased fee and lease-
hold interests
$506,000 nc
*19 na Appendix B, 8.25% Table, Column 5, 20 years. nb Figure is rounded. nc Appendix B, 9% Table, Olumn 4, 20 years. nd Appendix B, 12.5% Table, Column 5, 20 years. The factor to produce $80,000 would be $80,000./.$11,000=7.272727, which by interpolation reflects an interest rate of approximately 12.4%. [8]/ 2. The Discount Rate to be Applied
Although the American Institute of Real Estate Appraisers uses a 12.5 percent discount of the lessee's annual rental advantage in making the illustrated leasehold interest appraisal, we think a larger percentage is required here. The rental savings for which the instant *20 lease provides do not stem from an increase in prevailing rental rates which occurred after the lease was signed. The rent provided by this lease was renegotiated by the Port and SFO effective August 1, 1963, less than a year before the valuation date of June 30, 1964. Nor does it reflect an increased rental value attributable to improvements placed on the land by the tenant. [9]/ Rather the extremely low actual rent provided in the lease is attributable in large part to certain unique factors in the leasehold arrangement which benefited the Port but, to some extent, cast burdens on petitioner, limited its rights, and increased its risks as the lessee-successor to SFO. While these factors help explain the low actual rent provided by the lease, they also affect the value of the leasehold as such in the hands of petitioner or any other assignee and require a substantial discount in placing a June 30, 1964, value on the leasehold. First, as pointed out in our Findings, *21 the lease obligated KTVU, in connection with its station identification, to use the words "Jack London Square in the Port of Oakland" at least once during each 6-hour segment of the broadcast day. [10]/ It is clear from the testimony that the actual rent payable under the lease was set at a lower figure because SFO, the lessee, agreed as a "condition" to the lease to provide advertising of Jack London Square. [11] This advertisement lasted approximately 5 seconds, and KTVU charged $200 for individually contracted 5-second spot advertisements in 1964. There is no evidence in the record from which one can determine the charge for multiple advertisements purchased by one advertiser. Although a precise amount of discount cannot, therefore, be assigned to this condition of the lease, we think the obligation to make these announcements on behalf of "Jack London Square in the Port of Oakland" must be considered when establishing a rate by which to discount the value of the agreed rental savings. True, presenting this advertisement actually cost petitioner nothing, but the same could be said of any individual spot advertisement KTVU made. This advertisement, like all others, consumed *22 a portion of KTVU's potential advertising time, and the obligation to make it over the 14 years remaining in the lease term was a significant burden which would have to be carried by petitioner or assumed by any successor-lessee. *23 Second, the lease expressly provided that it could not be assigned, hypothecated, or encumbered in any way and that the space which it covered could not be sublet in whole or in part without the consent of the Port.[12]/ Although the lease provides such consent shall not be withheld unreasonably, the report of one of petitioner's experts states in part: * * * the Port selects and chooses the tenants that it desires and does not accept just any applicant or business that comes to them seeking to rent property. The undersigned personally attempted to rent space in the Port office building about the time of this study and was refused space because our business was not Port oriented and was not complementary to the established pattern of the Square. The *24 Port Commission only desires tenants who will complement other tenancies in the development and help to build up the prestige and business potential of Jack London Square. * * * There was testimony to the same effect. This means that the anticipated rental savings had virtually no liquidity in the form of sales value, potential collateral, or other use. Any substantial restriction on the right to liquefy an investment in anticipated saving obviously renders that investment less valuable. This factor takes on added significance from the facts that SFO was described by petitioner's witnesses as the only local television station without a network affiliation and as having only a limited rental budget allowance. A possible need to assign the lease, sublet part or all of the premises, or pledge assets as collateral at some point in the 14-year period cannot be disregarded. Moreover, when this provision is combined with the requirement for spot advertisements, it is evident that the lease could be assigned only to another television station. There were only three other such stations in the San Francisco-Oakland area. This limited market for the lease thus increases a purchaser's *25 (or petitioner's) risks and requires a further discount in determining the value of the anticipated rental savings. Third, the property covered by the lease was a single-purpose structure designed for use in an industry which was undergoing rapid technological changes. The rented structure, which was built to KTVU's detailed specifications, was comprised of about 60 percent of television production facilities and about 40 percent of finished office space. The production facilities were used for television broadcasts; they contained two large studios, control rooms, decorated audience reception areas, workrooms, storage areas, and numerous other facilities required for television broadcasting. Structural steel girders were used to provide adequate studio height and lighting. When explaining why the Port was willing to give petitioner's predecessor the favorable lease, petitioner's reply brief in this Court included the following statement: As the Port was amortizing its cost in the KTVU facility on a twenty-five year basis * * * if KTVU were to abandon the facility the Port would be left with a substantial unamortized cost in a "white elephant", a fact Respondent concedes on *26 page 19 of his Brief. It was therefore important in terms of Oakland's civic pride and the Port's economic interest in securing the return of its investment, for the Port to continue KTVU's favorable position. The record establishes that this is precisely what happened. If the rented facility itself were a white elephant in the context of an open market, it seems clear that a lease on that same facility would also be a white elephant. Thus, petitioner was further limited in its ability to assign the lease or otherwise liquefy the anticipated rental savings by the fact that the leased property was suitable only for use by a television station. [13]/ This provision thus increases the hazards of an investment in the leasehold. *27 Fourth, in case the lease was terminated by the lessee, an onerous liquidated damage provision applied. If petitioner wished to terminate the lease, it was required to give 6 months notice and to pay the Port 60 percent of the "unamortized cost to the Port of the entire building constructed by the Port * * * based upon amortizing the cost of said building * * * in twenty (20) years on a straight-line formula basis." As discussed in footnote 22, infra, the cost of the building evidently was $261,103.20. If the construction cost was greater, as petitioner has argued in other contexts, the risk imposed by this provision is increased proportionately. Fifth, the lease imposed upon petitioner as lessee an obligation to keep and maintain "the demised premises, including all buildings, structures, facilities and improvements * * * in good order and repair and in tenantable condition," ordinary wear and tear and damage due to designated types of casualties excepted. In this respect, petitioner as the lessee was bound by an express waiver of certain provisions of California law [14]/ giving a lessee the right to make repairs at the expense of the lessor. [15]
*28 Finally, if the building were destroyed by fire, earthquake, or other casualty, to an extent in excess of 50 percent of the then value thereof, the Port was given the privilege, upon 30 days written notice, to cancel and annul the lease. [16]/ In that event, the right to the rental advantage would terminate. In the light of the whole record, including in particular the foregoing factors, we think that a substantial discount must be applied to the amount of the anticipated rental savings. In our best judgment, taking into account all the facts, that discount should not be less than 15 to 20 percent as applied to the agreed annual rental savings of $68,012.04. On this basis, *29 rounding the figures, we arrived at a value of $350,000. [17]/ In arriving at this discounted June 30, 1964, value, we have not attempted to assign individual percentages to the numerous factors taken into account. To do so would be illusory, but we are satisfied that a purchaser of the lease would consider those factors in arriving at a discount rate. [18]/ As explained by the Supreme Court in Palmer v. Connecticut Ry. Co.,311 U.S. 544, 559 (1941), a case involving damages for the breach of a long-term lease: *30 Future rental value cannot be susceptible of precise proof. * * * To require proof of value approaching mathematical certitude would bar a recovery for an actual injury suffered. All that can be done is to place before the court such facts and circumstances as are available to enable an estimate to be made based upon judgment and not guesswork. Every anticipatory breach of an obligation, and every appraisal of damage involving the present value of property involves a prediction as to what will occur in the future. Present market value of property is but the resultant of the prediction of many minds as to the usability of property and probable financial returns from that use, projected into the future as far as reasonable, intelligent men can foresee the future. We are aware that a theoretically pure application of the income approach to valuation of the lease would require some of the foregoing factors to be quantified and added to the actual rent of $26,200 per annum [19]/ payable under the lease with the result that a smaller discount rate would be applied. But in the trial of the case the parties took the extreme positions, the respondent that the lease had no value *31 and the petitioner that it had a value in excess of $1,000,000. The result is that the trial record does not provide sufficiently precise information to permit the Court to add exact amounts to the actual rental figure called for by the lease. After all, however, the income approach to valuation serves only as a tool to assist in estimating value. It does not provide an answer with the precision of a mathematician's slide rule. We are convinced that investors in the market woul take the factors which we have discussed into account and that the discount rate we have used is reasonable in the light of the entire record. *32 Petitioner contends that the value of the lease of the building alone was $957,667 and that, to this figure should be added $110,368 as the value of the parking area, bringing the total value to $1,058,053. But the lease and the rent paid by petitioner covered the parking area as well as the building. No evidence before us suggests that the tenants to whom the Port rented space comparable to the KTVU studio facilities or offices were not provided with equally adequate parking accommodations. It is true that one of petitioner's witnesses testified that tenants "in some cases" were allowed parking privileges on a nonexclusive basis and that restaurants were given validation privileges. But there is no evidence on the parking rights or, indeed, as to any other rights or burdens of the tenants whose rental rates were compared with those paid by petitioner. [20]/ Taking into account SFO's anticipated use of the property and the impracticability of leasing the building without the parking space or the parking space without the building, we think that the parking lot rights acquired by petitioner were an integral part of the rights conferred by the lease with respect to the building. *33 They cannot realistically be assigned a separate value. Neither the parking area not the building would have been as valuable without the other. Accordingly, we accept the agreed amount of $957,667 as the total difference between the actual rent to be paid over the 14-year term of the lease and the fair market rental for the same period. Moreover, according to *34 petitioner's witness, Holabird, in 1964 the value of the land was $3.75 per square foot, or a value of $190,354 [21]/ and, according to petitioner's witness, Gross, the replacement cost of the building at the time was $800,000, [22] a total of $990,354. Thus, petitioner's $1,058,053 claim to a June 30, 1964, premium value for the 14-year lease, for which it was required to pay annual rent of $26,200, exceeds the then value of the fee simple itself by over $67,000 ($1,058,053 minus $990,354). Adopting petitioner's position would require the conclusion that the June 30, 1964, value of the Port's fee simple ownership of the land and building, if unleased, was less than the value of petitioner's 14-year leasehold. Neither burdens attaching to ownership of the fee nor special advantages of a tenancy over outright ownership are cited to justify that position. In the light of all the facts, we think petitioner's position is quite incredible. *35 We are aware that one of petitioner's experts testified that, in his opinion, the space occupied by KTVU had an annual rental value of $3.60 per square foot and that he applied no discount in arriving at a much larger value for the lease. He reasoned that, because there is no rental escalation provision in the lease, any discount would be offset by anticipated increases in rental values as a result of inflation. But this analysis overlooks the fact that, if inflation affects future rental rates, it also affects the future worth of the dollar and thus the value of the income to be received under the lease. Accordingly, to be consistent, the expert's analysis would require an adjustment for inflation in arriving at the 1964 value of the anticipated savings in rent over the subsequent 14-year period. To be sure, the impact of inflation on these two elements may not be the same. However, petitioner introduced no evidence which would indicate that the impact on rental values would outweigh that on the purchasing power of the dollar. Moreover, there is no indication that petitioner's expert gave weight to the discount factors discussed above. Although petitioner itself explained *36 how the agreed figure of $957,667 was computed, set forth in footnote 6, supra, petitioner now maintains that the mandate of the Court of Appeals does not permit us to value the lease as such. Rather, according to petitioner, "'discount' is now the only factor to be applied to the total rental savings in determining the Lease value." Petitioner argues: There is no legal or factual difference between the Lease in the hands of the lessee, Petitioner, and an annuity in the hands of the annuitant. Like the annuitant, Petitioner purchased the right to receive fixed, periodic payments (cost savings) for a fixed number of years. * * * We do not so interpret the Court of Appeals mandate. As pointed out above, the appellate court directed us to make a "revaluation of the leasehold interest [emphasis added]," to explain the method or "formula used to value the lease [emphasis added]," and to explain the "factors rendering that choice of formula appropriate." Even if we accept petitioner's position, however, that on remand we are not to value the lease as such but only to discount the rental savings as if they were an annuity, we would arrive at no greater value. *37 The terms of the lease, viewed as an annuity, would still have to be considered. As discussed above, the right to anticipated rental savings caries with it conditions, and thus risks, which do not accompany the right passively to receive unconditional monthly annuity payments from an insurance company. First of all, petitioner was able to obtain the benefit of the rental savings only on condition that it paid the monthly rent of some $2,183.33. Petitioner's own witness, as noted above, described KTVU as the only local television station without a network affiliation and as having a limited rental budget allowance. There was a risk in 1964 that KTVU would not be able to use the space profitably for 14 years. Moreover, several factors we have already noted substantially affect the value of the anticipated savings under the lease contract. These factors are the obligation as a condition of the lease to make a 5-second spot advertisement of "Jack London Square in the Port of Oakland" each 6 hours of television time; the restriction on assigning, hypothecating, or transferring the annuity rights; the practical difficulties of marketing the lease and the consequent lack of liquidity *38 due to the single-purpose nature of the leased building; the penalty in the amount of 60 percent of the unamortized cost of the leased building payable in case of the lessee's termination of the lease; the obligation to keep the interior of the building in repair; and the Port's option to cancel the lease in the case of a fire, earthquake, or other casualty which damaged the building as much as 50 percent. All these factors, when contrasted with the usual terms of an annuity contract, in our judgment would require that the anticipated rental savings, if review as an annuity be discounted by at least 15 to 20 percent. The decision as originally entered by this Court will be reinstated. An appropriate order and decision will be entered.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.
2. /The term "fair market value" as used in other Internal Revenue Code provisions means "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor to sell and both being informed." E.g., O'Malley v. Ames,197 F.2d 256, 257↩ (8th Cir. 1952). We think the term has the same meaning in these regulations.
3. /↩ On remand, neither party requested an opportunity to offer additional evidence.
4. / In its opinion the Court of Appeals stated in part: The parties now agree that the difference between the actual rent to be paid over the remaining fourteen year term of the lease and the fair market rental for the same period was at least $957,667. * * * [Fn. ref. omitted.] The Commissioner maintains on remand that the lease had no fair market value on the valuation date and that he did not agree before the appellate court that there was any amount of rental savings under the lease. Although petitioner's reply brief in the Court of Appeals states that the Commissioner had so agreed, the Commissioner's brief contains no such concession. When arguing that the application of Hoskold's formula would support the lease's value as found by this Court, the Commissioner's brief in the Court of Appeals used the figures set forth in footnote 6, infra,↩ as taken from the taxpayer's appellate court brief. However, the Commissioner here denies that the argument constituted an agreement as to the amount of rental savings. Nonetheless, we recognize that the agreement described by the Court of Appeals may have been reached in oral argument before that court. Accordingly, we accept the Court of Appeals' statement that the difference between the actual rent to be paid over the remaining 14-year term of the lease and the fair market rental for that period was at least $957,667. 5. In the terminology used by real estate appraisal authorities, these terms are respectively called "contract rent" and "economic rental value." E.g., The Appraisal of Real Estate, prepared by the Textbook Revision Subcommittee, American Institute of Real Estate Appraisers (7th ed. 1978), pp. 469-478. ↩
6. In Petitioner's Response to Order of Court dated July 20, 1979, and Motion under Rule 155(b), petitioner explained the manner in which the $957,667 was computed as follows: The Court [Tax Court] agreed with Petitioner that the Lease had a premium value in that, while petitioner was paying only $26,200 per annum in rent, the annual fair market value rent for the building and its underlying land was as much as $94,200, without considering the parking area. Based upon these findings of facts, a savings of $957,667 would be realized over the Lease term. n1
n1 On the basis of the 16,000 sq. ft. of production facilities and 11,000 sq. ft. of office space in the KTVU building, which is the makeup of the 27,000 sq. ft. in the building (Pabst, Tr. 19; Mueller, Tr. 62; Gross, Tr. 148; Petitioner's Ex. 11 - floor plan of KTVU), and this Court's finding that the Board of Commissioners of the Port of Oakland "was leasing unfinished space to other tenants at a rate of 10 cents to 20 cents a square foot per month"; that the "[finishing] costs comparable to those incurred for the studio facilities might add as much as 10 cents per square foot per month to rental charges"; and that "[finished] office space comparable to KTVU's office space was renting at approximately 35 cents per square foot per month" (Tax Ct. Opinion, 8), the computation is as follows: ↩
11,000 sq. ft. at.35/sq. ft./mo.
$ 3,850.00
16,000 sq. ft. at.25/sq. ft./mo.
4,000.00
Total Fair Market Value (for build-
ing/mo.)
7,850.00
Less: Actual rent/mo. (26,200./.12)
2,183.33
Total Excess of Fair Market Rental
Value (for building/mo) Over Actual
Rental/mo.
$ 5,667.67
$5,667.67 X 169 months (Stip., P26)=
$957,667.23
7. / In The Appraisal of Real Estate, supra at pp. 320-321, the steps involved in translating the net income projection into a value indication with respect to real estate generally are summarized as follows: 1. Estimate potential gross income. 2. Estimate and deduct a vacancy and collection loss allowance to derive effective gross income. 3. Estimate and deduct expenses of operation to derive net operating income (net income before recapture). 4. Estimate remaining economic life or the duration and pattern of the projected income stream. 5. Select an applicable capitalization method and technique. 6. Develop the appropriate rate or rates. 7. Complete the necessary computations to derive an economic value indication by the income approach. In principle this method of computing a present value on gross income (except for step 2) is applicable to placing a present value on anticipated rental savings. In the instant case, the major problem is to determine an appropriate discount rate to be applied to the anticipated savings.↩
8. /↩ Appendix B to which these footnotes refer comprises a series of compound interest annual tables (ranging from 3 percent to 30 percent) which may be used, among other purposes, to compute the present value of money to be collected--in the instant case rental savings--over a specific future period. Column 5, mentioned in the footnote, is entitled "Present Worth One Per Period"; it sets forth the present value of a series of future amounts, in the instant case the anticipated annual rental savings, over stated periods at stated percentage rates.
9. /↩ The Aug. 1, 1963, supplement to the lease refers to SFO's construction of a $30,000 facility but petitioner has not argued that the addition of this structure had any material effect on the rental rate.
10. / Paragraph 4 of the lease provides: It is a condition of this lease that the words "Jack London Square in the Port of Oakland" will be used in connection with the identification of this television station during station breaks in its telecasting or otherwise, at least once during each six hour time segment of the broadcast day. ↩
11. One of petitioner's experts testified in part as follow: Q. Is it possible that the Port was deriving other than dollars directly from KTVU, was deriving other benefits from KTVU's location, which in its mind made it willing to give KTVU a concession? A. Absolutely. I think that was a major purpose for the Port being willing to rent the space to KTVU as a television station for less than it would have rented the space to someone who was not in the same type of business. Q. How often is a television station required to identify its call letters and city license or city of -- or whatever it is it's required to identify? A. It's required to identify itself every half an hour. It frequently identifies itself more often at the end of every program segment. * * *
Q. Well, wouldn't a station ordinarily incorporate into that FCC required identification commercial advertising? A. Yes. Q. Incorporate it how? A.It can. That's the idea that-- Q. In other words, as a series on each side of the FCC required identification, they also sell spots. Is that-- A. Yes. It's a five second spot announcement. Q. Do you happen to know whether -- I take it your testimony was that the station was, in fact, selling five second spot announcements in 1964. A. The station had those spots for sale on its rate card. Other testimony shows that a single 5-second spot announcement was sold for $200 in 1964.↩
12. / Paragraph 15 of the lease provides in part: Lessee shall not, either directly or indirectly, assign, hypothecate, encumber or transfer this lease or any interest therein, or sublet the whole or any part of the demised premises, or license the use of same in whole or in part without written consent of Lessor evidenced by resolution of said Lessor, which consent, however, shall not be withheld unreasonably. * * *↩
13. / There is no suggestion that comparable properties were subject to these same infirmities. The testimony with respect to the rental charge for comparable office space was as follows: Q. On the average, what was that office space [in the Square] renting for in 1964? A. That was renting for around 35 cents a square foot per month. * * *
Q. Would this have been a reasonable rate for KTVU's office space as office-- A. I think it would. No rental space comparable to KTVU's studio area was available for rent, and as suggested by the material in footnote 6, supra,↩ the rent for comparable space was computed by using the rental rate for unfinished space and adding the cost of finishing such space.
14. /Cal. Civ. Code Ann. secs. 1941 and 1942 (West 1954), referred to in the lease, in the form in effect when the lease was signed, are as follows: Sec. 1941. Buildings for human occupancy; fitness; repairs The lessor of a building intended for the occupation of human beings must, in the absence of an agreement to the contrary, put it into a condition fit for such occupation, and repair all subsequent dilapidations thereof, which render it untenantable, except such as are mentioned in section nineteen hundred and twenty-nine. Sec. 1942. Repairs by lessee; rent deduction; limit If within a reasonable time after notice to the lessor, of dilapidations which he ought to repair, he neglects to do so, the lessee may repair the same himself, where the cost of such repairs do not require an expenditure greater than one month's rent of the premises, and deduct the expenses of such repairs from the rent, or the lessee may vacate the premises, in which case he shall be discharged from further payment of rent, or performance of other conditions. Cal. Civ. Code Ann. sec. 1929 (West 1954), referred to in sec. 1941 is as follows: Sec. 1929. Repairs The hirer of a thing must repair all deteriorations or injuries thereto occasioned by his want of ordinary care. ↩
15. This obligation was subject to the following proviso with respect to exterior and structural repairs: Notwithstanding anything to the contrary herein contained, the Lessor shall during the term of this lease at its own cost and expense maintain and make all necessary structural repairs to said building and to the exterior of said building; provided always, however, that the Lessor shall not be obligated to make any such repairs if the same shall be required by reason of any act or omission of the Lessee, its agents, servants, employees or persons on the premises with the consent of the Lessee, which latter repairs the Lessee hereby agrees to and shall make at its own cost and expense. The Lessee agrees to give to the Lessor written notice of any necessary repairs which the Lessor shall be obligated to make as herein provided, and to afford the Lessor a reasonable opportunity to make such repairs.↩
16. / Paragraph 9 of the lease is, in pertinent part, as follows: If, during the term of this lease, said television studio building shall be damaged or destroyed by fire, earthquake or other casualty to an extent in excess of fifty per cent (50%) of the then value thereof, the Lessor is hereby granted the privilege, upon giving thirty (30) days' written notice to the Lessee (such notice to be given within thirty (30) days after such damage or destruction) to cancel and annual this lease; * * *↩
17. / Using the factor (5.229299) taken from the American Institute of Real Estate Appraisers tables, described in footnote 8, supra,↩ for the "Present Worth One Per Period" discounted at a 17-percent rate for a 14-year period, the present value of the anticipated annual rental savings of $68,012.04 is $355,655.29. Using a factor (5.008062) for the "Present Worth One Per Period" discounted at an 18-percent rate for a 14-year period, the present value is $340,608.51.
18. /↩ Because the agreement described by the Court of Appeals refers to "the remaining fourteen year term of the lease," we have used an annual figure of 14 years rather than a monthly figure of 169 months. Computations based on 196 months rather than on 14 years produce different figures. For instance by dividing the total rental savings of $957,667 by 14, the number of lease years remaining, produces an annual savings of $68,404.78. But these differences are relatively small and do not affect our conclusion as to the value of the leasehold.
19. /↩ The lease as amended on Aug. 1, 1963, calls for an annual rent of $27,600. The actual figure of $26,200 is computed by allowing petitioner, pursuant to a lease provision, a credit against the contract rent for one-half of local taxes paid on the possessory interest attributable to the leasehold covering municipally-owned land. Petitioner thus was required to pay taxes over and above the actual rent of $26,200 used in the foregoing computations. We have not treated this tax liability and additional payment as a factor to be taken into account in determining the appropriate rate for discounting the rental savings because it is not clear that the lessees of the comparable space did not also pay such a tax.
20. / The witness was asked whether the rentals for the comparable office space tenants provided for the exclusive use of land. He answered "No" but immediately explained that he referred to "some cases" and to "some people like restaurants" as follows: Q. Now did the rentals for other space in Jack London Square which you examined at the Port and found comparable or not comparable to KTVU provide for exclusive use of land in addition to that underlying the buildings? A. No. Parking in some cases was allowed on a nonexclusive basis. Some people like restaurants are given validation privileges where they can stamp their customer's card for one hour free parking. In fact, they've even done away with that now today. That's different. You have to pay a quarter and then you get free parking beyond that.↩
21. /↩ As we understand the facts, this figure is somewhat excessive. The first supplement to the lease reduced the land covered by the lease from 1.349 acres to 1.062 acres, i. e., 46,260.72 square feet. At $3.75 per square foot, the value of the land would be $173,477.70.
22. This $800,000 replacement cost was computed by multiplying the 27,000 square feet in the building by an estimated replacement cost of $30 per square foot. In our Memorandum Findings of Fact and Opinion, we stated that we were skeptical of this replacement cost figure, and we remain skeptical. The rent provided in the lease as originally executed was $1,630 per month bu, if the cost of the building to be constructed by the Port exceeded $250,000, the rent was to be adjusted upward by "an amount equal to the percentage of such excess which the amount of the monthly rental for said building and improvements * * * bears to said sum of" $250,000. The second supplemental agreement with respect to the lese, dated Aug. 1, 1963, recites that on Aug. 1, 1960, the rent to be paid for the building was adjusted to $1,702.18. In the report of petitioner's expert, Holabird, it is stated that: "According to the lease between KTVU and the Port, the building was originally constructed in 1958 by the Port of Oakland for KTVU at a cost of $261,103.20." The lease was a joint exhibit and the Holabird report was introduced by petitioner. These documents cannot be dismissed as hearsay. We think it quite incredible that the cost of constructing the building more than tripled between 1958 and June 30, 1964. Under the American Institute of Real Estate Appraisers formula, set forth above in the text, the total value of the two partial interests, lessor's leased fee interest and lessee's leasehold interest, should tend to equal the value of the unleased fee (although this may not necessarily be so). Due to lack of what we regard as a reliable appraisal of the fe, we are unable to make this comparison. We note, however, that petitioner's land value ($190,354) plus the claimed undepreciated replacement cost ($800,000) exceeds the combined values of the partial interests computed under the formula. However, petitioner's land value ($190,354) plus the undepreciated apparent cost of the building ($261,103) is less than such combined values.↩